# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID MARSHALL CRISP,<br><br>Defendant. | Case No.: 1:11-cr-00026-JLT-1<br><br>ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE<br><br>(Doc. 675) |

On September 14, 2020, David Marshall Crisp filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) based on his medical condition and the risks allegedly posed to him by the ongoing COVID-19 pandemic. (Doc. 664.) The Court denied Defendant's motion on August 18, 2021. (Doc. 675.) On March 4, 2022, Crisp filed a second motion for compassionate release.[1] (Doc. 676.) The motion was referred to the Federal Defender's Office, counsel for which filed a supplemental brief in support of Defendant's motion. (Doc. 678; 679.) The Government filed its opposition on May 5, 2022 (Doc. 682) and Defendant filed his reply on May 19, 2022. (Doc. 687.) For the reasons set forth below, Defendant's second motion for compassionate release is **DENIED**.[2]

---

[1] As Defendant's reply clarifies, although Defendant, acting *pro se*, titled the instant motion as one for reconsideration, it is intended to be a new motion for compassionate release based on three new grounds (Doc. 687 at 2), and the Court will construe it as such. Accordingly, the Government's argument that Defendant's motion is untimely as it is one for relief under Federal Rule of Civil Procedure 59(e) will not be considered. (*See* Doc. 682 at 8.)

[2] Defendant also seeks appointment of former counsel, which will also be denied as there is no further issue before the Court. (Doc. 676 at 1.)

1

## I.     Background

On January 13, 2011, Defendant was charged by way of indictment with one count of conspiracy to commit mail fraud, wire fraud, and bank fraud in violation of 18 U.S.C. § 1349 (Count 1); 33 counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 2-34); 10 counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 35–44); 11 counts of bank fraud and aiding and abetting bank fraud in violation of 18 U.S.C. § 1344 and 2 (Counts 45-55); and one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h) (Count 56). (Doc. 1.) The Government's case against Defendant focused on his leadership role in a massive scheme to defraud various mortgage lenders through straw buyers to artificially inflate the prices of homes so that the true owners of the properties could fraudulently extract the purported increased equity from each home sale. (Doc. 348 at 5-8.) Defendant and his co-defendant Carlyle Lee Cole owned and operated Crisp, Cole Associates (a.k.a. Crisp & Cole Real Estate), a real estate brokerage firm, and Tower Lending, an affiliated mortgage brokerage. (*Id.* at 6.) Crisp, Cole, and, to a lesser degree, co-defendant Julie Farmer were found to have managed the conspiracy to defraud the lenders and it was they who directed their many co-defendants, including family members, in carrying out the massive fraud. (*Id.*) The mortgage lenders suffered losses totaling nearly $30 million due to Defendants' fraudulent scheme. (*Id.* at 7.)

On December 16, 2013, Defendant entered a guilty plea to Count 1 (conspiracy to commit mail fraud, wire fraud, and bank fraud). (Doc. 278, 284, 297.) Pursuant to his plea agreement, defendant Crisp agreed not to seek any downward departure from the advisory U.S. Sentencing Guidelines ("U.S.S.G.") with respect to his offense level or his criminal history category and retained the right only to argue at sentencing for a downward variance from the guidelines based upon consideration of the factors set forth at 18 U.S.C. § 3553(a) to a sentence of not less than 10 years in prison. (Doc. 278 at 4-5.) Following his guilty plea, the Court determined that Defendant's adjusted offense level was 38, and his criminal history placed him in category I, according to the U.S.S.G.; this resulted in an advisory sentencing guideline range calling for a term of imprisonment of between 235 and 293 months. (*Id.* at 4.) The U.S. Probation Office recommended a sentence of 235 months. (*Id.*) On March 31, 2014, the Court sentenced Defendant to 211 months in prison with a 60-month term of supervised release to

follow.[3] (Doc. 433.) In addition, the Court ordered Defendant to pay the mandatory $100 special assessment fee and $28,210,420.48 in restitution. (*Id.*) Pursuant to the parties' plea agreement, the Government dismissed the remaining counts against Defendant at sentencing.

Defendant is currently serving his sentence at United States Penitentiary, Satellite Prison Camp in Atwater, California.[4] On March 4, 2022, Defendant filed the instant motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. 676.) On May 5, 2022, the Government filed its opposition to the motion (Doc. 682), and on May 19, 2022, Defendant filed his reply thereto. (Doc. 687.)

## II.     Legal Standard

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018 ("FSA"), motions for compassionate release could only be filed by the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[5] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after

---

[3] The sentencing judge imposed a below-guideline sentence to match the 211-month sentence imposed on co-defendant Carlyle Lee Cole in order to avoid unwarranted sentencing disparity, since both defendants played substantially similar roles in the commission of the fraud. (*See* Doc. 541 at 47.)
[4] *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Aug. 15, 2022).
[5] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

>>considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>>(i) extraordinary and compelling reasons warrant such a reduction; or
>>(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[6]

The policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S.S.G. § 1B1.13[7]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, the Ninth Circuit recently held that "the current version of U.S.S.G. §1B1.13 is not an 'applicable policy statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir.

---

[6] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[7] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

4

2021). "In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant." *Id.* The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

In so holding, the Ninth Circuit joined the five other circuits who have addressed this issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A) motions filed by the BOP Director, and does not apply to § 3582(c)(1)(A) motions filed by a defendant." *Id.*; *see also, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement §1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ("In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" (citation omitted)); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in [defendant's] case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.").

In the past, when moving for relief under 18 U.S.C. § 3582(c), the defendant bore the initial

burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts that have done so have agreed that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020).

### III.     Analysis

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission.["] *Id.* Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id.*

*United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v. Ramirez-Suarez*, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973-74; *United States v. Trent*, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor under 18 U.S.C. § 3582(c)(1)(A), release must be "consistent with" the sentencing factors set forth in § 3553(a)).

### A.     Administrative Exhaustion

Section 3582(c)(1) permits a defendant to apply to a federal district court for sentence modification only "after the defendant has fully exhausted all administrative rights to appeal the failure of the BOP to bring a motion . . . or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Defendant submitted his administrative request to the warden at USP Atwater on January 21, 2022. (Doc. 676 at 20.) As the Government concedes, more than 30 days have elapsed since Defendant's request was received. (Doc. 682 at 5.) Thus, Defendant has exhausted his administrative remedies.

**B.      Extraordinary and Compelling Reasons**

Defendant seeks compassionate release based upon the following allegedly new grounds: (1) Defendant's current family circumstances are such that Defendant is the "sole available caregiver for [his] ailing father" to "meet his myriad of needs"; (2) Defendant "fits all eligibility criteria" listed under the CARES Act for Home Confinement Release; and (3) there is a disparity between Defendant's custodial sentence and the sentence that would have been imposed had sentencing occurred after the enactment of the First Step Act. (Doc. 676 at 2.)[8]

"Extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)-(D). Even though the catch-all, "other reasons" provision, was included in the policy statement at a time when only BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions under the FSA. *See, e.g.*, *United States v. Kesoyan*, 2020 WL 2039028, at *3-4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

  1.      Family circumstances

Defendant alleges he is the sole available caregiver for his "ailing" father, George Kenjalo, whom he alleges has "early sign's [sic] of dementia" and can no longer care for his own daily needs. (Doc. 676 at 4.) Defendant asserts Mr. Kenjalo is a veteran who requires "live in assistance to help with meal preparation, shopping, clean-up, adult diaper assistance, and scheduling and transporting him to and from medical appointments." (*Id*.) According to Defendant, his sister can no longer provide care for Mr. Kenjalo as she is a single mother of four and works full time. (*Id*.) In addition, Defendant alleges that his brother, who also helped care for Mr. Kenjalo at times, unexpectedly passed away in November of 2020. (*Id*.) The Government contends Defendant "has not met the burden of establishing an extraordinary and compelling reason." (Doc. 682 at 9.)

Section 1B1.13 provides that "family circumstances" include "[t]he death or incapacitation of

---

[8] Because the Court construes the instant motion as one for compassionate release, the Court declines to consider the arguments already raised in Defendant's previous motion for compassionate release "in tandem" with the instant motion, as Defendant requests. (Doc. 676 at 2.)

the caregiver of the defendant's minor child or minor children," or "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13, cmt. n.1 (C). The Court recognizes a circuit split[9] as to whether, after the enactment of the FSA, extraordinary and compelling family circumstances may extend to beyond the criteria set forth in § 1B1.13. In light of the Ninth Circuit's decision in *Aruda*, while U.S.S.G. § 1B1.13 may inform its determination, the Court is not restricted thereby and instead has "full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Jones*, 980 F.3d at 1111. In doing so, however, the Court cannot find that Defendant's family circumstances present an extraordinary and compelling reason to grant compassionate release.

Many inmates have aging parents with various ailments. If a sick parent—absent truly extraordinary circumstances—was considered a compelling reason, virtually any inmate seeking a sentence reduction on this ground could produce one. Although Mr. Kenjalo's condition is extremely sad, the circumstances surrounding the need to care for him are not extraordinary based on the facts presented.

First, if Mr. Kenjalo is entirely incapable of caring for himself, as Defendant asserts, it is unclear why there is no indication of his needs prior to the instant motion. Defendant's first motion for compassionate release was largely based on the risks of COVID-19 due to his medical condition. (*See* Doc. 664.) Besides not raising the issue of Mr. Kenjalo's condition in the motion, attached exhibits are enlightening. For example, Defendant's release plan from 2018 included his plan—appearing to have already been set in motion—to live with a close friend, Ty Stewart, in San Diego. (Doc. 664-6 at 4.) Defendant stated he had a job "waiting" for him there, and that he intended to find his own residence

---

[9] *See, e.g., United States v. Rojas*, 2021 WL 4690509, at *1 (S.D. Cal. Oct. 7, 2021) ("This court follows the growing number of district courts that have concluded that, in the absence of applicable policy statements, courts can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant compassionate release.") (quoting *Rodriguez*, 424 F. Supp. at 674) (quotation marks omitted); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (holding that courts could consider factors not enumerated in § 1B1.13); *United States v. Yoda*, 2020 WL 5502325, at *2 (S.D.N.Y. Sept. 11, 2020) ("[T]he Court refuses to countenance the notion that § 3582(c)(1)(A)(i) categorically bars consideration of certain kinds of familial relationships when ascertaining whether compassionate release is warranted."); *but see United States v. Cortez*, 2020 WL 6875432, at *4 (E.D. Cal. Nov. 23, 2020) ("The policy statement regarding compassionate release, however, does not provide relief for inmates on the basis of their parents or grandparents."); *United States v. Ingram*, 2019 WL 3162305, at * 2 (S.D. Ohio, July 16, 2019) ("[F]amily circumstances that constitute 'extraordinary and compelling reasons' simply do not include [Defendant's] mother. Many, if not all inmates, have aging and sick parents."); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) ("While certainly admirable, a desire to help care for one's elderly parents does not qualify as an 'extraordinary and compelling reason' for release under U.S.S.G. § 1B1.13, nor, therefore, under 18 U.S.C. § 3582(c)(1)(A)(i).").

within 120 days of release, which he thought he should be able to accomplish based on his "immediate verifiable employment." (*Id*. at 3.) In November of 2019, Defendant confirmed his plan to live with Mr. Stewart in San Diego. (Doc. 664-1 at 7.) This is concerning to the Court. If Mr. Kenjalo's condition is so poor and he has suffered from prostate cancer and kidney problems requiring dialysis in the past (Doc. 676 at 23), it is perplexing that Defendant did not plan to assist with his care previously.

Most noteworthy is that on January 11, 2022, Defendant submitted an Inmate Request to Staff, which included a typed summary of Defendant's "factual eligibility criteria's [sic]" for home confinement under the CARES Act. (Doc. 676 at 49-51.) Defendant indicated that upon release, he planned to live with his sister, April, and her four children, and that there were no health concerns of any individuals in the residence. (*Id*. at 50.) Defendant's request made no reference to Mr. Kenjalo or his need for a caregiver. On January 21, 2022, less than two weeks later, Defendant sent an electronic request to the warden at USP Atwater, stating his request and grounds for compassionate release, which included the need to care for his ailing father. (*Id*. at 20.) Moreover, Defendant proffers three e-mails from Mr. Kenjalo from April of 2021 as evidence of Mr. Kenjalo's dementia. (*Id*. at 25-28.) Thus, it seems that Defendant was aware of Mr. Kenjalo's condition when requesting review for home confinement. Similar to his previous omissions, Defendant failed to raise his concerns regarding Mr. Kenjalo's need for care until his decision to file the instant motion. Only now does he rely on his father's condition.

Second, the record fails to establish that there is no one available to care for Mr. Kenjalo. In support of Defendant's contention that his sister, April, can no longer provide the "time consuming caregiver needs [Mr. Kenjalo] requires," Defendant attaches April's declaration under penalty of perjury, dated February 11, 2022. (Doc. 676 at 4, 22-23.) April states that Mr. Kenjalo requires assistance with daily activities, that he repeats himself and reorders the same items—such as adult diapers—repeatedly and unnecessarily, and that he has a history of falling. (*Id*. at 22-23.) In pertinent part, April states that prior to his death, her deceased brother would help with Mr. Kenjalo's falls and hygiene issues. (*Id*. at 22.) She also states Mr. Kenjalo has "fallen and could not get himself back up for hours." (*Id*. at 23.) Despite her father's seemingly poor condition, April declares that she is "no

9

1  longer" Mr. Kenjalo's sole caregiver and that she "had to let [her] father go and move on with [her]
2  life. (*Id*. at 22-23.) Finally, April states that her mother has agreed for a short period of time "to give
3  [Mr. Kenjalo] a place to stay." (*Id*. at 22.)

4  Taken as true, the Court construes the above-cited statements to mean that either Mr. Kenjalo
5  does not need a caregiver for daily activities, as Defendant argues[10], or that April, her mother, or
6  someone not indicated is currently providing Mr. Kenjalo the care he requires, contrary to April's
7  declaration. If the latter is the case, Defendant's assistance is not strictly required. The instant motion
8  was filed nearly seven months ago. The Court is hard-pressed to believe that Mr. Kenjalo has been left
9  to fend for himself because Defendant is the only person willing and capable of assuming the role.

10  Third, April's declaration states that Mr. Kenjalo does not have enough "financial assistance"
11  to move to a nursing home. (Doc. 676 at 23.) Defendant does not appear to assert, however, that Mr.
12  Kenjalo is unable to obtain public assistance. There is a great percentage of the population who lack
13  family-caregivers, and public agencies—namely adult services agencies—are available to assist those
14  individuals like Mr. Kenjalo.[11]

15  Finally, Defendant does not explain why in September 2020, when his first motion for
16  compassionate release was filed, April was able to care for Mr. Kenjalo, but now it is too difficult for
17  her to continue. April's declaration states that being Mr. Kenjalo's sole caregiver has taken its toll on
18  her and her family, both physically and mentally. (Doc. 676 at 23.) It appears that her cessation as
19  caregiver was recent. However, Defendant does not provide any explanation, other than the lack of
20  occasional help from Defendant's deceased brother, why the toll on April and her family has suddenly
21  reached its irreparable peak. Additionally, though April declares she "had to let [her] father go and
22  move on with [her] life", she thereafter, in the same declaration, offers her home to not only Mr.
23  Kenjalo, but her brother to live.[12] (*Id*.) If the living situation was untenable, it is unclear why she
24  would, even temporarily, allow Mr. Kenjalo—and another person—to live in her home again.

---

[10] The Court is not convinced this is the case, as Defendant's father's needs appear to be substantial.
[11] *Programs & Services*, https://aging.ca.gov/Programs_and_Services/ (last visited Aug. 16, 2022).
[12] It is also concerning to the Court that attached to his first motion for compassionate release was a letter in support of clemency written by Defendant's friend, Ty Stewart, which stated that Defendant had "two teenagers at home who need their father." (Doc. 664-5 at 4.) The instant motion contains no mention of Defendant's children or his intent or responsibility to care for them.

The Court is sympathetic to the difficulties imposed on Defendant's family due to his conduct. "Unfortunately, 'when someone commits a serious crime and is caught, the felon's family members are almost always among the primary victims of the result of his misconduct and suffer both financially and psychologically.'" *United States v. Jackson*, 2022 WL 1182696, at *4 (E.D. Wash. Apr. 20, 2022) (quoting *United States v. Henareh*, 2021 WL 119016, at *4 (S.D.N.Y. Jan. 13, 2021)). Thus, based upon the foregoing, Defendant fails to show that his family circumstances provide extraordinary and compelling reasons to grant compassionate release.

### 2. The CARES Act

Defendant's arguments with respect to the Coronavirus Aid, Relief, and Economic Security ("CARES") Act,[13] although not entirely clear, appear to be that (1) the BOP erred in determining Defendant did not initially meet the eligibility criteria, (2) the BOP abused its discretion by not releasing Defendant to home confinement although he now meets the criteria, and (3) that the Court should consider these circumstances when determining whether there are extraordinary and compelling reasons warranting compassionate release. (*See* Doc. 676 at 5-8.)[14]

Defendant alleges that upon submitting several inmate requests regarding his release to home confinement, he received a response from a Camp Administrator on September 16, 2021. (Doc. 676. at 5.) The response stated that Defendant was reviewed for home confinement under the CARES Act but "at the time, [he] did not meet the criteria." (*Id*. at 5-6, 32.) Defendant then inquired as to which of the criteria he did not meet. (*Id*. at 6, 32.) The Camp Administrator explained that Defendant was denied because he did not have a "viable release plan." (*Id*.) Shortly thereafter, the Camp Administrator sent another response, which stated: "Your release address has been added. You will still need to request a

---

[13] The CARES Act was passed on March 27, 2020, in response to the ongoing COVID-19 pandemic. *See generally* Pub. L. 116-136, 134 Stat. 281 (2020). In particular, the CARES Act expanded the BOP's discretionary power to place prisoners in home confinement based upon the "totality of the circumstances for each individual inmate, the statutory requirements for home confinement . . . a non-exhaustive list of discretionary factors" and an assessment of various COVID-19 risks. Off. of the Att'y Gen., Mem. for Dir. of Bureau Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (March 26, 2020), https://www.justice.gov/file/1262731/download (last accessed Aug. 16, 2022).

[14] The Government argues Defendant is attempting to "circumvent" the BOP's "exclusive authority to determine whether, and when, to transfer an inmate to home confinement." (Doc. 682 at 9.) Defendant concedes the Court lacks this power (Doc. 687 at 2-3), and the Court agrees. *United States v. Velazquez*, 2020 WL 3452070, at *2 (D. Ariz. June 24, 2020) ("While the CARES Act gives the BOP broad discretion to expand the use of home confinement during the COVID-19 pandemic, the Court lacks jurisdiction to order home detention under this provision.").

relocation of your supervision in writing once you are 12-15 months from your projected release date." (*Id*. at 6, 33.) Consequently, Defendant argues that the BOP made a "factual error" in conducting Defendant's initial review, which has kept Defendant from being transferred to home confinement. (*Id*. at 6.) Accordingly, Defendant asks the Court to consider the harm this alleged error has caused to his eligibility for early release as a "serious factor" in determining whether to grant compassionate release. (*Id*. at 8.)

Defendant also alleges that despite meeting the eligibility criteria for home confinement under the CARES Act, he has not been released from custody. (Doc. 676 at 2.) Defendant asserts that the BOP's "refusal" to transfer him to home confinement is an "abuse of discretion" and "appears to be part of a pattern." (*Id*. at 2, 6; Doc. 679 at 6.) As a result, Defendant seeks "a reduction of his sentence to time served on the ground that the BOP has been far too reluctant to use its authority to transfer federal prisoners to home confinement." (Doc. 687 at 3.)

First, Defendant does not—in his motion, supplemental brief, or reply—cite to any authority to support the argument that BOP's initial "error" and subsequent "refusal" to transfer Defendant to home confinement despite meeting criteria under the CARES Act are factors to consider for compassionate release, let alone extraordinary and compelling reasons to grant such release. (*See* Doc. 676 at 6; Doc. 679 at 6.) The court in *United States v. Rodriguez*, 2022 WL 282547 (E.D. Pa. Jan. 31, 2022) was faced with a similar issue. In *Rodriguez*, the BOP approved the defendant's transfer to home confinement under the CARES Act, and subsequently revoked it. *Id*. at *2. The defendant moved for compassionate release, claiming the BOP's "error" constituted an extraordinary and compelling reason for compassionate release. *Id*. at *1-2. The court, in liberally construing the motion, found it plausible that the defendant was arguing he met "extraordinary and compelling reasons for a sentence reduction because the [BOP] previously determined he [was] eligible for release under the CARES Act." *Id*. at *4.[15] In finding the defendant did not meet his burden, the court explained:

> We have located no authority finding the Bureau of Prisons's decision finding relief warranted under the CARES Act conclusively establishes extraordinary and compelling reasons for a sentence modification when reviewing a motion for compassionate release. Nor has Mr. Rodriguez

---

[15] On the face of the motion, the court also addressed the possibility that the defendant was requesting the court to order the BOP to release him. Defendant is not requesting this relief. *Rodriguez*, 2022 WL 282547, at *3.

> provided any. The standard and relief requested under the CARES Act are different than the standards we review on a motion for compassionate release [footnote omitted]. We have no basis to conclude the Bureau's alleged decision conclusively establishes extraordinary and compelling reasons.

*Id.*

The Court interprets *Rodriguez* to signify that a decision by the BOP under the CARES Act—irrespective of whether relief is found to be warranted—is not sufficient to conclusively establish extraordinary and compelling reasons for compassionate release. Likewise, consideration of the CARES Act criteria is not required in making a compassionate release determination. Similarly, citing to no authority, Defendant is asking the Court to grant compassionate release based on both BOP's "error" in its decision that he did not meet the CARES Act criteria and the fact that he allegedly now meets the criteria. Therefore, the Court will not consider the BOP's decision under the CARES Act, nor will it consider the criteria under the CARES Act in determining whether compassionate release is warranted in this case.[16]

Moreover, the main objective of the CARES Act is to protect at-risk inmates from the dangers of COVID-19, which Defendant concedes. (*See* Doc. 679 at 7 (referencing Congress's decision that the program should be a tool "to save vulnerable prisoners from death and serious illness due to COVID-19.").) In its order denying Defendant's first motion for compassionate release, the Court found that Defendant did not have a sufficiently serious medical concern presenting an increased risk of serious illness due to COVID-19. (*See* Doc. 675.) Thus, it is illogical for the Court to consider criteria under an Act designed to protect at-risk inmates when the Court has already determined Defendant is not one of those inmates.

Next, whether the BOP erred or abused its discretion is for neither Defendant nor the Court to decide. *See* 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *see also United States*

---

[16] Home confinement and compassionate release are two distinct requests for relief. *United States v. Purify*, 2021 WL 5758294, at *2 (10th Cir. Dec. 3, 2021) ("The CARES Act expanded the BOP's power to place a prisoner in home confinement in light of the pandemic. Conversely, a person who seeks compassionate release under § 3582(c)(1)(A) is seeking a reduction in his sentence from the court. Thus, a request for a CARES Act transfer to home confinement is completely distinct from a request for compassionate release under § 3582(c)(1)(A).") (internal citations and quotation marks omitted); *see also United States v. Velazquez*, 2020 WL 3452070, at *2 (D. Ariz. June 24, 2020) ("[A] request invoking the CARES Act is not the same as one invoking the First Step Act.").

13

*v. Massey*, 2021 WL 932005, at *2 (C.D. Ill. Mar. 11, 2021) ("[T]he CARES Act does not give the courts any role in the Bureau of Prison's determination of suitable candidates for release to home confinement.") (citing *United States v. Williams*, 829 F. App'x 138, 139 (7th Cir. 2020). Nevertheless, even if the Court did consider the circumstances and criteria surrounding his request for home confinement under the CARES Act, Defendant would not meet his burden. Defendant assumes that once an address was added to his file, his release plan became "viable," and he now unquestionably satisfies the criteria. Again, Defendant offers no support for this argument and the BOP's e-mail response does not support either of these propositions. (*See* Doc. 676 at 35 ("Your release address has been added. You will still need to request a relocation of your supervision in writing once you are 12-15 months to your projected release date.").) Defendant also impliedly asserts that he would have certainly been transferred to home confinement absent the BOP's "error," and that the transfer would have occurred by now. (*See id*. at 6.) This assumes that by meeting the criteria, Defendant is guaranteed to be transferred to home confinement—and in a manner Defendant finds to be timely. (*See id*. ("Defendant has tried 15 attempts with staff at SPC Atwater, for nearly 6 months and has gotten nowhere.").) Defendant fails to acknowledge a key point: release to home confinement under the CARES Act is at the BOP's discretion. *See Velazquez*, 2020 WL 3452070, at *2. Satisfying the discretionary factors—or claiming they are satisfied—does not give Defendant an undeniable right to home confinement.

Finally, in an attempt to bolster his argument that there is an abuse of discretion at USP Atwater, Defendant's arguments further convince the Court that this is not an extraordinary circumstance. Defendant highlights that only one inmate has been transferred to home confinement under the CARES Act. (Doc. 676 at 7.) It is not necessary to confirm the veracity of Defendant's assertion because it is clear this is not a situation unique to Defendant. If the BOP's discretionary decision not to transfer an inmate to home confinement under the CARES Act was an extraordinary and compelling reason to grant compassionate release, every inmate denied by the BOP would be free to bypass the CARES Act while relying on the same denial as grounds for a different type of relief: compassionate release. As a result, not only could all potentially-ineligible inmates be released under 18 U.S.C. § 3582(c)(1)(A), the entire purpose of the CARES Act—and home confinement in

general—would be defeated. The BOP's discretion would be worthless. The Court declines to compensate for what Defendant sees as an "error" and "abuse of discretion" by granting compassionate release. Thus, Defendant fails to show that his circumstances with respect to home confinement under the CARES Act constitute extraordinary and compelling reasons to grant compassionate release.

### 3. Retroactivity of earned time credits

Defendant's third ground for release is the disparity between the custodial sentence he is currently serving and that which would have been imposed had he been sentenced after the enactment of the First Step Act in 2018. (Doc. 676 at 8.) Defendant argues that if his ability to accrue "earned time credits" was applied retroactively to when he was sentenced in 2014, his custodial sentence would be reduced considerably. (*See* Doc. 687 at 3.) The Government argues that "[t]he change in how BOP awards Earned Time Credits after 2018 does not provide any basis for [Defendant's] motion." (Doc. 682 at 11.)

"The First Step Act of 2018 reformed various aspects of the federal prison system." *Adkins v. Ponce*, 2021 WL 3666176, at *1 (C.D. Cal. Aug. 17, 2021). One aspect was the creation of a system allowing for "earned time credits" upon an inmate completing "evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A). Notably, the FSA provides that "[a] prisoner may *not* earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed *prior to the date of enactment* of this subchapter." 18 U.S.C. § 3632(d)(4)(B)(i) (emphasis added).

Defendant relies on three cases to support his contention that because the benefit of earning time credits does not retroactively apply to time served prior to the enactment of the FSA, extraordinary and compelling reasons exist to justify early release. However, all the cases Defendant cites to pertain to significant sentencing disparities, not earned time credits. *See United States v. Padilla*, 2022 WL 1190224 (E.D. Cal. Apr. 21, 2022) (142-month disparity); *United States v. Kanohokula*, 572 F. Supp. 3d 895 (D. Haw. 2021) (guideline range disparity of 111-139 months); *United States v. Rodgers*, 2022 WL 605354 (E.D. Cal. Mar. 1, 2022) (204-month disparity). As the Government articulates:

15

> The First Step Act did not make any change to the sentencing guidelines applicable to [Defendant's] case. Consistent with the PSR's findings in 2014, if [Defendant] were sentenced today he would still face a base offense level of 7 (§ 2B1.1(a)(1)), a 22-level increase based on a stipulated loss amount of over $29 million (§ 2B1.1(b)(1)(L)), a 2-level increase for more than 10 victims (§ 2B1.1(b)(2)(A)(i)), a 2-level increase for the use of sophisticated means (§ 2B1.1(b)(10)(C)), a 2-level increase as he derived more than $1 million in gross receipts from one or more financial institutions (§ 2B1.1(b)(17)(A)), a 4-level increase based on his aggravating role as the organizer and leader of the fraud conspiracy (§ 3B1.1), a 2-level increase for abuse of a position of trust (§ 3B1.3), and a 3-level reduction for acceptance of responsibility (§ 3E1.1). (*Compare* Doc. No. 348 (PSR) ¶¶ 34-40 *with* USSG (2021 ed.).) [Defendant's] total offense level would remain 38, and his applicable guideline range would remain 235 to 293 months imprisonment. (Doc. No. 348 ¶ 71; USSG (2021 ed.).) [Defendant] cannot point to any subsequent Guidelines change that would lead to the Court imposing a lower sentence were he sentenced today.

(Doc. 682 at 10.) Defendant does not raise a sentencing disparity in this case. Thus, none of the three cases Defendant relies upon are instructive. Moreover, Defendant cites to no authority supporting his argument that the lack of retroactivity of earned time credits is an extraordinary or compelling reason to grant compassionate release. The Court thus declines to depart from the express intent of Congress that the ability to earn time credits does not apply prior to enactment. 18 U.S.C. § 3632(d)(4)(B)(i); *see also Smallwood v. Thompson*, 2021 WL 5112663, at *1 (E.D. Cal. Nov. 3, 2021), *report and recommendation adopted*, 2021 WL 6113789 (E.D. Cal. Dec. 27, 2021) (quoting § 3632(d)(4)(B)(i)); *Mulholland v. Thompson*, 2021 WL 3847572, at *1 (E.D. Cal. Aug. 27, 2021), *report and recommendation adopted*, 2021 WL 6051319 (E.D. Cal. Dec. 21, 2021) (same).

Finally, and perhaps most importantly, the Court agrees with the Government's argument that this change is not extraordinary, "as it would apply potentially to every inmate who was serving a sentence prior to 2018 and became eligible to earn the new credits after the enactment of the First Step Act." (Doc. 682 at 11.) Accordingly, Defendant has failed to show that extraordinary and compelling reasons warrant compassionate release as to the retroactivity of earned time credits.

### 4. COVID-19 concerns and rehabilitation efforts

Defendant restates his COVID-19 concerns and rehabilitation efforts as grounds for compassionate release. (Doc. 676 at 10-11.) However, Defendant does not assert these are new grounds, nor can he. (*See id.* at 2.) These arguments were raised in Defendant's first motion for

compassionate release, which was denied on August 18, 2021. (*See* Doc. 664; 675.) As the Court explained above, arguments made on a prior motion for compassionate release will not be revisited on a subsequent motion for compassionate release or considered "in tandem" with the new grounds Defendant asserts. Thus, though the Court commends Defendant's extensive rehabilitation efforts and encourages their continuance, the Court declines to address these arguments.

### C. Consistency with the § 3553(a) Factors

Because the instant motion fails to establish extraordinary and compelling reasons justifying compassionate release, the Court need not address whether a reduction in Defendant's sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a). Even so, Judge Drozd determined in his prior order denying compassionate release that a reduction would not be consistent with the § 3553(a) factors because of the amount of financial harm committed, the length of an equally culpable co-defendant's sentence, and the fact that Defendant had served only 89 months of his 211-month below-guideline sentence. (Doc. 675 at 12-15.) The Court echoes the reasoning of the prior order, notwithstanding the fact that Defendant has now served approximately 12 more months since the order was issued. Approximately 110 months of Defendant's sentence remain to be served and Defendant has not provided new information from which the Court could reevaluate or depart from Judge Drozd's original finding on this point. Therefore, Defendant's motion will also be denied on the basis that his release would not be consistent with the § 3553(a) sentencing factors.

## IV. Conclusion

Based upon the foregoing, the Court **ORDERS**:

1. Defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), filed March 4, 2022 (Doc. 676), is **DENIED**.

IT IS SO ORDERED.

Dated: **August 17, 2022**

UNITED STATES DISTRICT JUDGE